MAINE SUPREME JUDICIAL COURT                             Reporter of Decisions
Decision:     2014 ME 74
Docket:       Fra-12-490
Argued:       April 9, 2014
Decided:      June 10, 2014

Panel:        SAUFLEY, C.J., and ALEXANDER, SILVER, MEAD, GORMAN, and JABAR, JJ.

STATE OF MAINE

v.

JULIA PECK

SAUFLEY, C.J.

[¶1]  Julia Peck appeals from a judgment entered in the District Court (Franklin County, *Carlson, J.*) after a bench trial finding that Peck committed the civil violation of cruelty to animals, *see* 7 M.R.S. §§ 4011(1)(E), 4016(1) (2013); prohibiting Peck from owning, possessing, or having on her premises any animals except two spayed or neutered cats, *see id.* § 4016(1)(C); requiring Peck to pay a fine of $500 plus surcharges, *see id.* § 4016(1)(A), and $18,000 in restitution to the State, *see id.* § 4016(1)(B); 14 M.R.S. §§ 3141(1), (4), 5602 (2013); and requiring her to post a bond of $6,400 to support during the appeal process the cats that were seized from her home by the State, *see* 17 M.R.S. § 1021(6)(D) (2013).  Peck contends that the court abused its discretion in quashing a subpoena that would have compelled one of her witnesses to testify; that the cruelty-to-animals statute is unconstitutionally vague, *see* 7 M.R.S. § 4011(1)(E); and that the record contains

2

insufficient evidence to sustain a finding of cruelty to animals and to support the court's restitution order. We affirm the judgment.

## I. BACKGROUND

[¶2] On March 22, 2012, the State charged Peck with one count of the civil violation of cruelty to animals. *See id.* §§ 4011(1)(E), 4016(1). Although the facts would have permitted the State to charge Peck with numerous counts of cruelty to animals, the prosecutor reached an agreement with Peck whereby only one charge would be filed, but evidence regarding the twenty-six cats seized by the State would be admissible. The agreement represents a compassionate exercise of prosecutorial discretion because it exposed Peck to only one mandatory fine of $500 while enabling the court to address each incident of alleged cruelty to animals. *See id.* §§ 4011(1)(E), 4016(1)(A). Had Peck been charged with and found to have committed the number of counts of cruelty to animals commensurate with the number of cats the State seized, the mandatory minimum fine would have totaled $25,500, rather than $500. *See id.* § 4016(1)(A).[1]

[¶3] The court held a three-day bench trial in which Peck was unrepresented by counsel. The State presented evidence of its substantial efforts to assist Peck and her eventual decision to cease cooperating with the State. From the extensive

---

[1] For the first civil offense, the court must impose a mandatory fine of not less than $500, and for the second and subsequent offenses a fine of not less than $1,000 is mandated. 7 M.R.S. § 4016(1)(A) (2013).

and detailed evidence regarding the very poor health of the twenty-six cats and kittens seized from Peck, the court made the following findings of fact, which are fully supported by the record.

[¶4] In July 2011, local officials became aware that Peck was keeping a substantial number of cats at her home. Peck was unable to keep up with the outbreak of illnesses and infections among the cats, and only took her cats to a veterinarian when they were very ill or near death. Although State and local officials attempted to help Peck reduce her cat population over a period of months, the State ultimately seized twenty-six of the cats. Each of the seized cats suffered from one or more medical problems such as mycoplasma, toxoplasmosis, tapeworm, ringworm, an upper respiratory disease, conjunctivitis, fleas, and ear infections; some were so ill that they bore stillborn litters. The State spent approximately $36,800 to treat, house, and care for the cats.

[¶5] On September 4, 2012—one day before the final day of trial—one of Peck's witnesses, a doctor of veterinary medicine, sent a letter to the court asking to be excused from testifying. The court treated the witness's request as a motion to quash Peck's subpoena to testify. In his request, the witness stated that he received Peck's subpoena on Sunday, September 2, 2012, leaving him "one business day" to prepare and clear his schedule. He asserted that complying with Peck's subpoena on such short notice would cause him to cancel meetings with

4

"twenty-five to thirty clients," inconveniencing each client, impoverishing his business, and costing him "an inestimable amount of goodwill"; and that complying with Peck's subpoena would cause him to miss a lunchtime retirement party for his employee of twenty years.[2] The court quashed Peck's subpoena on September 5, 2012, the last day of trial.

[¶6] The court made oral findings of fact, stating that Peck "committed cruelty to animals based upon a failure to supply these . . . 26 cats that were seized by the State on January 11th, 2012, [with] necessary medical attention," and imposed a single fine of $500.[3] *See* 7 M.R.S. § 4016(1)(A). The court also orally ordered that Peck post a bond of $6,400 with the court to support the cats while her appeal to us was pending. *See* 17 M.R.S. § 1021(6)(D). On September 6, 2012, the court issued a written judgment limiting the number of animals that Peck may own, possess, or have on her premises to two spayed or neutered cats and ordering restitution of $18,000—approximately half of the sum the State spent to house and care for the cats—to be paid in monthly installments of $100.[4] *See* 7 M.R.S. 4016(1)(B)-(C); 14 M.R.S. § 3141(4) (authorizing courts to order installment

---

[2] In what appears to be a typo, the witness stated that "Wednesday the 4th" was the employee's last day. September 4, 2012, the day the witness composed the request, was a Tuesday, such that the Wednesday referred to in the letter, the day the witness was subpoenaed to testify, was most likely September 5, 2012.

[3] After applicable surcharges and assessments, the fine ultimately totaled $620.

[4] If Peck makes a $100 payment every month, the entire debt of $18,000 will take fifteen years to satisfy.

payments if "requiring the defendant to make immediate payment in full would cause a severe and undue hardship for the defendant"). Peck timely appealed. *See* 14 M.R.S. § 1851 (2013); M.R. App. P. 2(b)(3).

## II. DISCUSSION

A. Motion to Quash

[¶7] Peck argues that the court erred in failing to hold a hearing on the veterinary doctor's motion to quash and failing to provide its reasons for quashing Peck's subpoena.[5] "On timely motion, the court for which a subpoena was issued shall quash or modify the subpoena if it[, inter alia,] fails to allow a reasonable time for compliance [or] subjects a person to undue burden." M.R. Civ. P. 45(c)(3)(A)(i), (iv). Despite the absence of Maine case law or a rule explicitly authorizing a nonparty witness to move to quash a subpoena ad testificandum, *cf. State v. Grover*, 387 A.2d 21, 21-22 (Me. 1978) (holding that a nonparty witness has no right to appeal the denial of a motion to quash), the Advisory Committee Note to M.R. Civ. P. 45 recognizes motions to quash as "the remedy for nonparties," M.R. Civ. P. 45 Advisory Committee Note to 2007 amend. "The decision to quash a subpoena . . . rests in the discretion of the court." *State v. Watson*, 1999 ME 41, ¶ 5, 726 A.2d 214.

---

[5] The court appropriately treated the witness's letter as a motion to quash. *See* M.R. Civ. P. 7(b)(1) (defining "motion" as "[a]n application to the court for an order" made orally or in writing).

6

[¶8] Given Peck's late delivery of the subpoena and the assertions set forth in the prospective witness's motion to quash, the court did not abuse its discretion in quashing Peck's subpoena. *See* M.R. Civ. P. 45(c)(3)(A)(i), (iv). Although it is generally the best practice to allow the parties to be heard on the motion, Peck presents no information on appeal demonstrating that a hearing would have changed the outcome of the motion or the trial. *See* M.R. Civ. P. 26(g)(2); M.R. Civ. P. 45(e) (providing that Rule 26(g) governs "[m]otions or objections concerning subpoenas issued in discovery or pretrial proceedings").

B. Void for Vagueness

[¶9] The cruelty-to-animals statute provides that "a person, including an owner or the owner's agent, is guilty of cruelty to animals if that person . . . [d]eprives an animal that the person owns or possesses of . . . necessary medical attention." 7 M.R.S. § 4011(1)(E). The statute further provides that "[n]o person owning or responsible for confining or impounding any animal may fail to supply the animal with necessary medical attention when the animal is or has been suffering from illness, injury, disease, excessive parasitism or malformed or overgrown hoof." *Id.* § 4014 (2013). Peck contends that section 4011 is void for vagueness because it fails to define "necessary medical attention" in a manner that enables people of common intelligence to easily discern its meaning.

[¶10]  Although the void-for-vagueness doctrine is more commonly applied in the criminal law context, the doctrine is also applied in those circumstances where a person "must conform [her] conduct to a civil regulation."  *Me. Real Estate Comm'n v. Kelby*, 360 A.2d 528, 531 (Me. 1976) (quotation marks omitted). The due process clauses of the Maine and United States Constitutions require that a statute "must provide reasonable and intelligible standards to guide the future conduct of individuals and to allow the courts and enforcement officials to effectuate the legislative intent in applying these laws."  *Shapiro Bros. Shoe Co., Inc. v. Lewiston-Auburn Shoeworkers Protective Ass'n*, 320 A.2d 247, 253 (Me. 1974); *see* U.S. Const. amend. XIV, § 1; Me. Const. art. I, § 6-A.  "A statute may be void for vagueness when people of common intelligence must guess at its meaning."  *State v. Witham*, 2005 ME 79, ¶ 7, 876 A.2d 40.  "In examining the sufficiency of statutory language, [o]bjective quantification, mathematical certainty, and absolute precision are not required."  *Id.* (alteration in original) (quotation marks omitted).

[¶11]  Maine's cruelty-to-animals statute is not unconstitutionally vague. Rather, the statute expressly defines "necessary medical attention" as the attention required "when the animal is or has been suffering from illness, injury, disease, [or] excessive parasitism."  7 M.R.S. § 4014.  There is nothing about the statute that would require a person of ordinary intelligence to guess at its meaning.  *See*

*Witham,* 2005 ME 79, ¶ 7, 876 A.2d 40; *see also State v. Malpher*, 2008 ME 32, ¶¶ 17-19, 947 A.2d 484 (concluding that a statute that does not define the phrase "cruelly treated" is not void for vagueness).

C.    Sufficiency of the Evidence

[¶12]  Peck argues that the fact that her cats were sick does not necessarily mean that she deprived them of "necessary medical attention" and that, to the contrary, she provided her cats with holistic medication and took them to a veterinarian when they were sick.  Peck also argues that there was insufficient evidence in the record to support the court's restitution order and that the court should have ascertained her ability to pay in determining the amount of restitution for which she was liable.

[¶13]  "We review factual findings for clear error and the application of the law to those facts de novo." *State v. Thomas*, 2010 ME 116, ¶ 27, 8 A.3d 638.  We review the sufficiency of the evidence in the light most favorable to the State to determine whether the trier of fact could have found, by a preponderance of the evidence, each element of the charge.  *See State v. Black*, 2000 ME 211, ¶ 14, 763 A.2d 109; M.R. Civ. P. 80H(g).

1.    Necessary Medical Care

[¶14]  Contrary to Peck's contention, the record supports the court's finding that Peck's inability to keep up with the proliferation of her pets, which caused a

profusion of parasites and diseases to spread among the cats, constituted a failure to provide the animals with "necessary medical care." *See State v. Weinschenk*, 2005 ME 28, ¶ 8, 868 A.2d 200 ("Findings of fact are clearly erroneous only when no competent evidence supporting the finding exists in the record."); *Rinehart v. Schubel*, 2002 ME 53, ¶ 9, 794 A.2d 73 (stating that a "court is not required to believe the testimony of any particular witness, expert or otherwise" (quotation marks omitted)). Specifically, the court heard evidence that several of Peck's cats died shortly after Peck brought them to a veterinarian; all twenty-six seized cats had one or more medical problems; a respiratory disease was circulating among Peck's cats; Peck rebuffed the State's efforts to help her reduce the number of cats; against a veterinarian's advice, Peck took one kitten back from a veterinarian early in the State's work with her and the kitten nearly died; and the cats improved in health after receiving treatment.

2.     Restitution Order

[¶15]  The record taken as a whole reflects the parties' agreement that, in fashioning its restitution order, the court would consider the State's cost regarding all of the cats proven to have suffered cruelty while in Peck's care. Peck did not object to the court's consideration of the costs of providing for all twenty-six cats on this basis, and she recognized at the conclusion of the trial that significant restitution would be ordered. Thus, contrary to Peck's argument, the court did not

10

err in determining that the parties' agreement in advance of trial anticipated that the court would have the authority to consider the costs associated with all of the cats in fashioning the restitution order.

[¶16] "[A] court may order a person adjudicated as having violated the laws against cruelty to animals to pay the costs of the care, housing and veterinary medical treatment for the animal." 7 M.R.S. § 4016(1)(B). A court entering a restitution order on a civil complaint must consider the offender's "present and future financial capacity." *See* 17-A M.R.S. § 1325(1)(C) (2013); 14 M.R.S. § 5602 ("Title 17-A, chapter 54 applies to the determination, ordering, payment and enforcement of an order of restitution."). "[A]n offender who asserts a present or future incapacity to pay restitution has the burden of proving the incapacity by a preponderance of the evidence," 17-A M.R.S. § 1325(4), and the court was not required by statute to make explicit findings as to Peck's financial resources before ordering restitution payments, *id.* § 1325(1)(C).

[¶17] Peck did not meet her burden of demonstrating that she had no capacity to pay restitution. *See id.* § 1325(4). In ordering Peck to pay restitution, the court properly recognized Peck's financial limitations and more than halved the State's requested amount of $36,800 to $18,000. *See id.* § 1325(1)(C). The court further reduced the hardship of an immediate, lump sum payment by allowing the payment to be made in monthly installments of $100. *See id.*; 14 M.R.S.

§ 3141(4). The court's restitution order, which encompassed care, housing, and treatment costs for all of the twenty-six seized cats, is both reasonable and supported by the record. *See* 7 M.R.S. § 4016(1)(B); *Weinschenk*, 2005 ME 28, ¶ 8, 868 A.2d 200.

The entry is:

Judgment affirmed.

---

**On the briefs and at oral argument:**

Tawny L. Alvarez, Esq., Verrill Dana, LLP, Portland, for appellant Julia Peck

Andrew S. Robinson, Dep. Dist. Atty., Franklin County District Attorney's Office, Farmington, for appellee State of Maine

Farmington District Court docket number VI-2012-98
FOR CLERK REFERENCE ONLY