STATE OF MAINE
CUMBERLAND, ss

BUSINESS AND CONSUMER COURT
Location: Portland
Docket No.: BCD-CV-14-60

HARRIS MANAGEMENT, INC., and )
JJR ASSOCIATES, LLC, )

           Plaintiffs,

    v.

PAUL COULOMBE, PGC1, LLC and )
PGC2, LLC, )

           Defendants.

**DISCOVERY ORDER**

## I.    INTRODUCTION

On May 1, 2015, the Court instructed the Parties to file memoranda addressing three specific discovery issues: first, whether the crime-fraud exception applies to the attorney-client privilege asserted by Defendant, Paul Coulombe and how that determination should be made by the Court; second, whether the attorney-client privilege applies to communications made between the Defendant and certain third parties; and finally, whether phone records of non-parties John Suczynski and Dan Hourihan would likely lead to the discovery of admissible evidence. The Court addresses each in turn below.

## II.    BACKGROUND

In 2011, Jeff Harris sought to purchase the Boothbay Country Club from James Reeves, the principal of Boothbay Country Club, LLC. (Compl. ¶ 11.) However, the parties could not reach an agreement on price. (Compl. ¶ 11.) In the spring of 2012, Steven Malcolm of the Knickerbocker Group approached Harris Management about forming a group to acquire and further develop the Boothbay Country Club. (Compl.

1

¶ 12.) At all material times, Malcolm was acting as an agent of Defendant Paul Coulombe. (Compl. ¶ 13.) Plaintiffs allege that the proposal discussed in the spring of 2012 included talk of significant development of the Boothbay Country Club in addition to acquisition. (Compl. ¶ 14.) For example, there was discussion of building a new clubhouse, new golf facility, hotel, villas, and acquiring abutting real estate. (Compl. ¶ 16.)

Plaintiffs contend that it was the mutual understanding of the parties that Coulombe would provide the necessary capital, Malcolm would lead the project development relating to clubhouse construction, and Harris Management would provide long-term golf management services and would manage all new golf course construction. (Compl. ¶ 17.) Harris Management would provide golf management services for a multi-year term with several renewable terms. (Compl. ¶ 18.) However, after the commencement of additional discussion, Malcolm informed Jeff Harris that Coulombe no longer wished to move forward with the project. (Compl. ¶ 22.)

After learning that Coulombe was no longer interested, Harris Management resumed conversation with James Reeves in an attempt to acquire the Boothbay Country Club.[1] (Compl. ¶ 23.) In late December of 2012, Malcolm again contacted Jeff Harris and notified him that Coulombe had changed his mind and again wanted to pursue the joint venture. (Compl. ¶ 28.) Jeff Harris indicated to Malcolm that Harris Management was taking the necessary steps to purchase the Boothbay Country Club without

---

[1] On or about December 19, 2012, the Bank of Maine notified Boothbay Country Club, LLC and James Reeves of its intent to foreclose on the property. (Compl. ¶ 24.) An auction was scheduled to take place on January 28, 2013, at the offices of Bernstein Shur. (Compl. ¶ 24.) Jeff Harris indicated to the Bank of Maine that he would buy the Boothbay Country Club post-auction for $1.395 million. (Compl. ¶ 27.)

2

Coulombe's assistance and did not see the need to pursue the joint venture any further. (Compl. ¶ 30.) However, several conversations took place and an agreement was allegedly formed under the same terms discussed previously.[2] (Compl. ¶ 32.)

At the time of the negotiations, JJR Associates, LLC owned various lots of a subdivision at the Boothbay Country Club called "The Cottages." Plaintiffs contend that Coulombe's plans included various uses of the JJR lots. (Compl. ¶ 35.) Plaintiffs further allege that Coulombe did not want to purchase the Boothbay Country Club unless and until he owned the JJR lots. (Compl. ¶ 36.) Jeff Harris indicated to Coulombe that Harris Management would continue its efforts to purchase the Boothbay Country Club and would not sell the JJR lots unless Harris Management was given a long-term golf course management contract and the contract to manage the new golf course related construction as contemplated in the original agreement. (Compl. ¶ 38.)

Plaintiffs contend that a mutual agreement was reached and, as a result, JJR entered into a purchase and sale agreement with Coulombe on January 27, 2013, at a reduced price. (Compl. ¶ 40.) Further, Harris Management agreed not to compete with Coulombe in acquiring the Boothbay Country Club. (Compl. ¶ 4.) On January 31, 2013, Coulombe reached an agreement with the bank to purchase the club for $1.4 million. Thereafter, Coulombe closed on the property through a newly formed entity, PGC2, LLC. On February 27, Coulombe and another new entity, PGC1, closed on the JJR lots. (Compl. ¶ 45.) Ultimately, Plaintiffs contend that Coulombe voided the draft management contract that Harris had relied on in entering into the sales agreement and

---

[2] Harris Management would have a long-term management contract to manage the golf course operations and new golf construction. (Compl. ¶ 32.)

3

refraining from purchasing the country club and hired another party to manage the golf course.

## III. DISCUSSION

### 1. Crime-Fraud Exception to the Attorney-Client Privilege

The attorney-client privilege is "the oldest of the privileges for confidential communications known to the common law." *In re Motion to Quash Bar Counsel Subpoena*, 2009 ME 104, ¶¶ 13-14, 982 A.2d 330 (quoting *United States v. Zolin*, 491 U.S. 554, 562 (1989)). Its purpose is "to encourage full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and administration of justice." *Zolin*, 491 U.S. at 562 (quotation marks omitted). To fulfill that purpose, clients must "be free to make full disclosure to their attorneys of past wrongdoings." *Id.*

However, the privilege does not extend to those situations where "an attorney's advice is sought in order to commit or conceal ongoing or future wrongdoing." *In re Motion to Quash*, 2009 ME 104, ¶¶ 13-14, 982 A.2d 330. The Law Court has indicated that "[t]he privilege takes flight if the [attorney-client] relation is abused. A client who consults an attorney for advice that will serve him in the commission of a fraud will have no help from the law. He must let the truth be told." *Id.* (citing *Clark v. United States*, 289 U.S. 1, 15 (1933)).[3]

The Law Court has instructed that in order to trigger the crime-fraud exception, a party must prove by a preponderance of the evidence that the exception applies to pierce

---

[3] *See also* M.R. Evid. 502(d) (setting forth the crime-fraud exception in Maine).

4

the attorney-client privilege.[4] *Id.* ¶ 19. However, "a lesser evidentiary showing is needed to trigger *in camera* review than is required ultimately to overcome the privilege. The threshold . . . in other words, need not be a stringent one."[5] *Zolin*, 491 U.S. at 572. Thus, to trigger the *in camera* review process, the party asserting the crime-fraud exception "must present evidence sufficient to support a reasonable belief that in camera review may yield evidence that establishes the exception's applicability." *Id.* Once such a showing is made, the decision of whether to engage in *in camera* review rests in the discretion of the Court.[6] *Id.*

---

[4] The Law Court went on to explain:

> While the First Circuit has described the burden borne by the party seeking to invoke the crime-fraud exception as a requirement to make a "prima facie showing," or to establish a "reasonable basis" in order to find that the test for piercing the privilege has been satisfied, we conclude that the higher standard of proof by a preponderance of the evidence is necessary to protect this important evidentiary principle. We note with approval the reasoning of the Supreme Judicial Court of Massachusetts:
>
> > [T]he crime-fraud exception is a narrow one. Unless the crime-fraud exception applies, the attorney-client privilege may not be invaded, even where the communication concerns possible future criminal conduct, because an informed lawyer may be able to dissuade the client from improper future conduct, and, if not, under the ethical rules may elect in the public interest to make a limited disclosure of the client's threatened conduct. The party invoking the crime-fraud exception must prove by a preponderance of the evidence that the exception applies. *In re A Grand Jury Investigation*, 437 Mass. 340, 772 N.E.2d 9, 21-22 (Mass. 2002) (quotation marks omitted).

*In re Motion to Quash Bar Counsel Subpoena*, 2009 ME 104, ¶¶ 13-14, 982 A.2d 330.

[5] In Maine, the Law Court has not addressed the applicability of the *in camera* review process to the crime-fraud exception. However, the Court agrees that given the widespread acceptance of the *Zolin* Court's reasonable-belief standard, this Court has decided to follow the majority of state courts in this regard.

[6] In making such a determination:

5

In this case, the Plaintiffs have clearly satisfied the "reasonable belief" threshold to trigger *in camera* review of the questioned documents. For example, Plaintiffs have presented evidence that Coulombe's Attorney, John Carpenter, was aware of Coulombe's negotiations with Harris Management and of the proprietary information Coulombe obtained from the Plaintiffs. Email correspondence presented by the Plaintiffs indicates that Attorney Carpenter was also aware that Coulombe did not intend to honor the alleged agreement as Coulombe had reached out to and offered the job to another golf course manager, Dan Hourihan.[7] (Pl.s' Mot. 15.) The *in camera* review process does not destroy the privilege. It simply allows the Court alone to review documents which *may* yield evidence that would assist the Court in determining whether the crime-fraud exception applies to this case under the standard articulated by the Law Court in *In re Motion to Quash*, 2009 ME 104.

## 2. The Attorney-Client Privilege Does not Apply to Communications Shared With Third-Party John Suczynski

The Parties dispute whether the communications between Paul Coulombe, Attorney Carpenter, and third-party John Suczynski are communications protected by the attorney-client privilege. The Maine Rules of Evidence provide that "[a] client has a privilege to refuse to disclose, and to prevent any other person from disclosing, the

> The court should make that decision in light of the facts and circumstances of the particular case, including, among other things, the volume of materials the district court has been asked to review, the relative importance to the case of the alleged privileged information, and the likelihood that the evidence produced through in camera review, together with other available evidence then before the court, will establish that the crime-fraud exception does apply.

*United States v. Zolin*, 491 U.S. 554 (1989).

[7] Plaintiffs allege that Attorney Carpenter introduced Dan Hourihan to Paul Coulombe. (Pl.s' Mot. 15.) Carpenter in fact told Hourihan to "standby" and wait until Coulombe needed Hourihan's services. *Id.*

6

contents of any confidential communication . . . [b]etween the client or the client's representative and the client's lawyer or lawyer's representative." M.R. Evid. 502(b)(1). The rules define "representative of the client" as "a person who has authority on behalf of the client to . . . [o]btain professional legal services; or [a]ct on advice rendered as part of professional legal services." M.R. Evid. 502(a)(2). According to the Advisor's Note to Rule 502, the adoption of subsection (a)(2) in 1983 was intended to indicate which corporate employees' communications with counsel were privileged. Subsection (a)(2) embodies the "control group" test.[8] *Pinard v. Century 21 Guilmette Realty Co.,* 1989 Me. Super. LEXIS 182, *3 (Me. Super. Ct. Sept. 6, 1989).

Thus, to be protected by the attorney-client privilege, the evidence must show that Suczynski is a representative of Coulombe that had authority, at the time the allegedly privileged communications were made, to obtain professional legal services or act to on advice rendered. A communication involving an employee is privileged "so long as he or she is in a position to take a substantial part in deciding what action the corporation take on the advice of the attorney." Field & Murray, Maine Evidence, § 502.2 at p. 217 (6th ed. 2008). The Court finds that while Coulombe and Suczynski have worked together for

---

[8] The "control group" test "narrows the privilege, confining it to communications by persons of sufficient authority to make decisions for the client. It would not protect communications from lower-level employees to lawyers to enable them to advise a decision-making superior." Adviser's Note to 502(a)(2). Other courts have described the "control group" test in the following terms:

> [I]f the employee making the communication of whatever rank he may be, is in a position to control or even to take a substantial part in a decision about any action which the corporation may take upon the advice of the attorney . . . then, in effect, he is (or personifies) the corporation when he makes his disclosure to the lawyer and the privilege would apply.

*Philadelphia v. Westinghouse Electric,* 210 F.Supp. 483, 485 (E.D. Pa. 1962), *petition for mandamus and prohibition denied sub nom. General Electric Co. v. Kirkpatrick,* 312 F.2d 742 (3rd Cir. 1962), cert. denied, 372 U.S. 943 (1963).

7

many years, Suczynski did not become involved with Coulombe's golf course deal until March of 2013. Therefore any communications made before March 14, 2013, between Coulombe, Suczynski, and Attorney Carpenter are discoverable.

After March 14, 2013, the terms of Suczynski's employment were negotiated and his role became much more clear.[9] However, the circumstances of their professional relationship prior to this date are far less clear. In the little correspondence presented by the Parties, there was no indication of an anticipated start date, a salary, or even what Suczynski's responsibilities would be. Further, Suczynski's employment with White Rock Distilleries, a company previously owned by Coulombe, is immaterial. While this may demonstrate that Suczynski served in an advisory capacity in the past, this does not demonstrate that he had sufficient authority at the time in question to make decisions on behalf of Coulombe in relation to Coulombe's golf course venture. Thus, any and all communication between Suczynski, Coulombe, and Attorney Carpenter taking place before March 14, 2013, are not protected by the attorney-client privilege and must be turned over to the Plaintiffs.

3. The Phone Records of Non-Parties John Suczynski and Dan Hourihan are Likely to Lead to the Discovery of Admissible Evidence and Must be Produced

Plaintiffs contend that Dan Hourihan and John Suczynski's phone records between certain dates will lead to the discovery of admissible evidence in this case. Plaintiffs contend that the phone records are relevant in that both Hourihan and Suczynski are critical witnesses and the timing and existence of their communications with Paul Coulombe are necessary to establish Plaintiffs' cause of action.

---

[9] While the Court finds that Suczynski was an employee on or about March 14, 2013, for purposes of this discovery order, Defendants will still have the burden of establishing, on the record, the terms of his employment. Such a showing may be made through payroll records, W-2s, employment agreements, etc.

8

The scope of discovery is any matter that is relevant to the pending action. M.R. Civ. P. 26(b)(1); *Mahoney v. York Hosp.*, 2014 Me. Super. LEXIS 37, *2 (Me. Super. Ct. Feb. 18, 2014). For the reasons mentioned by the Plaintiffs, the Court finds that the records are relevant to this action. While Plaintiffs will have the ability to review the phone records of Mr. Coulombe,[10] the review of his records alone will not reveal conversation occurring between the non-parties (Hourihan and Suczynski) and other actors in this case. For example, conversations between Mr. Suczynski and Attorney Carpenter would not be reflected in Coulombe's records.

Pursuant to M.R. Civ. P. 45(c)(3)(A)(iv) the Court may modify or quash a subpoena if it "subjects a person to undue burden." However, the Court finds that the Defendants lack standing to challenge the subject subpoenas. *See Oliver B. Cannon and Son, Inc. v. Fidelity and Cas. Co. of New York*, 519 F. Supp. 668, 680 (D. Del. 1981) ("As a general matter, a party has no standing to seek to quash a subpoena directed to one who is not a party"); *see also See Mahoney v. York Hosp.*, 2014 Me. Super. LEXIS 37, *2 (Me. Super. Ct. Feb. 18, 2014). "Despite the absence of Maine case law or a rule explicitly authorizing a nonparty witness to move to quash a subpoena *ad testificandum*, the Advisory Committee Note to M.R. Civ. P. 45 recognizes motions to quash as the remedy for nonparties." M.R. Civ. P. 45 Advisory Committee Note to 2007 amend; *State v. Peck*, 2014 ME 74, ¶ 8, 93 A.3d 256. In this case, both Hourihan and Suczynski are non-parties to this action. The Defendants do not have standing to challenge the subpoenas issued by the Plaintiffs to these non-parties.

---

[10] Review of Mr. Coulombe's phone records will presumably reveal when phone conversations may have occurred between Coulombe and Hourihan, and Coulombe and Suczynski.

Further, even if the Court were to find standing, the request is not an undue burden. The Plaintiffs have presented a targeted timeframe in which they seek phone records. Thus, pursuant to the subpoenas, Hourihan and Suczynksi must turn over the requested phone records. Said request shall me made at the expense of the Plaintiffs.

## IV. CONCLUSION

Based on the foregoing, the entry shall be:

Defendants shall submit for *in camera* review those documents in its Privilege Log asserting protection under the attorney-client privilege;

Defendants shall permit the Plaintiffs to discover communications between Mr. Coulombe, John Suczynski, and Attorney Carpenter;

The Subpoenas issued to Dan Hourihan and John Suczynski stand and require the submission of their respective phone records for the specific time period mentioned therein. Plaintiffs shall bear the cost of said discovery request.

Pursuant to M.R. Civ. P. 79(a), the Clerk is herby directed to incorporate the

Order by reference in the docket.

Dated: July 1, 2015

_____/s_____
**M. Michaela Murphy, Justice**
**Business & Consumer Docket**

10

**Harris Management, Inc. and JJR Associates, LLC v. Paul Coulombe, PGCI, LLC and PGC2**

**BCD-CV-14-60**

**Harris Management, Inc. and JJR Associates, LLC**

    **Plaintiffs**

        Counsel:                      *James Poliquin, Esq. and*
                                           *Benjamin Donahue*
                                           Two Canal Plaza
                                           PO Box 4600
                                           Portland, ME 04112-4600

**Paul Coulombe,**
**PGCI, LLC and PGC2**

    **Defendants**

        Counsel:                      *Paul McDonald, Esq.and*
                                           *Eben Albert, Esq.*
                                           100 Middle St
                                           PO Box 9729
                                           Portland, ME 04104-5029