COURT OF APPEALS OF VIRGINIA

Present:   Chief Judge Decker, Judges Beales and Athey
Argued by videoconference


CHRISTINA M. MOLLENHAUER
                                                           OPINION BY
v.      Record No. 0803-20-2          CHIEF JUDGE MARLA GRAFF DECKER
                                                           JULY 6, 2021
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF DINWIDDIE COUNTY
Paul W. Cella, Judge

Linwood T. Wells, III, for appellant.

Rachel L. Yates, Assistant Attorney General (Mark R. Herring,
Attorney General, on briefs), for appellee.


Christina M. Mollenhauer appeals her conviction of child cruelty in violation of Code

§ 40.1-103.  On appeal, she contends that the portion of the statute under which she was

convicted is unconstitutionally vague.  She further asserts that the evidence was insufficient to

prove that her behavior violated the statute.  We hold that the appellant failed to properly

preserve her constitutional challenge for appeal.  Additionally, we conclude that the evidence

was sufficient to prove that she violated the statute.  Consequently, we affirm the conviction.

I.  BACKGROUND[1]

The victim, S.M., is one of four children of Robert Mollenhauer.  In October 2016, when

S.M. was three years old, Robert and his children began living with Robert's parents, Christina

Mollenhauer (the appellant) and Michael Mollenhauer.  Robert's wife, the children's mother,

---

[1] "Under well-settled principles of appellate review, we consider the evidence presented
at trial in the light most favorable to the Commonwealth, the prevailing party below." Camp v.
Commonwealth, 68 Va. App. 694, 698 (2018) (quoting Smallwood v. Commonwealth, 278 Va.
625, 629 (2009)).

also resided there initially, but the couple later divorced, and she moved out. The appellant and Michael helped Robert care for S.M. and her siblings.

In 2017 and again in 2018, different childcare and school officials contacted the Dinwiddie County Department of Social Services (DSS) due to concerns about S.M.

The information gathered during the ensuing investigation was wide ranging. It revealed that S.M. had more bruises than typical for children her age and that the family restricted S.M.'s access to food and kept her locked in a cage-like enclosure at night. The evidence also indicated that S.M. arrived at daycare or school with a black eye on at least two different occasions over the course of about a year and became nervous when asked what had happened. The family members who took her to daycare, including the appellant, explained the repeated bruising by saying that S.M. was "clumsy" and "f[ell] down a lot." A daycare provider reported that S.M. often started to "cower[] like she was a little bit scared" "when it was time to leave."

Regarding S.M.'s diet, the family told daycare employees that she was "allergic to everything" and could not have any snacks or other food from the facility. The amount of food she brought from home was "[n]ot even close to" what her peers were "bringing and consuming," and S.M. often said she was hungry and asked for more food. In addition, the daycare center was "told that [S.M.] couldn't have . . . cupcakes" or other treats due to allergies. However, one day when S.M. "had been good," the family "allowed [her] to [have] a cupcake" there, which contradicted the premise that dietary restrictions prevented her from consuming them. When S.M. reached kindergarten, the appellant gave school staff "strict directions not to give her any food" or sugar because it would "mess up" her bowels. S.M.'s lunches were small, and in the estimation of staff, she appeared "very hungry."

The investigation also revealed that Michael, with the permission of S.M.'s parents, built a cage-like enclosure in which S.M. slept at night. Michael characterized the enclosure as a special-needs bed and said that he made it, instead of buying one, to save money.

The evidence further showed that the family did not enroll S.M. in kindergarten in a timely fashion. The appellant reported that she "had concerns" about S.M. starting school because she was "not fully potty trained" and engaged in "bad" behavior including lying, stealing, and using bad words. The appellant and Robert told school employees that S.M. had bowel "accidents," which Robert characterized as happening "mostly on purpose." According to the appellant, the family had contacted S.M.'s doctor about whether school was appropriate for her in light of her behavior but "hadn't heard back." The school principal assured the appellant that the staff had a process for addressing any concerns about S.M. that might arise there.

Juxtaposed with the reports of S.M.'s family members that she was a "bad" child was information from daycare providers, teachers, and others that S.M. was sweet, smart, and well-behaved. They indicated that S.M. had occasional bowel and bladder control issues but described these as minor potty-training issues that improved over time.

The circumstances that triggered the instant charges arose in early September 2018. On September 5, S.M.'s second day of kindergarten, she arrived at school with a black eye, gave conflicting reports about how she sustained the injury, and seemed nervous when questioned. On September 6, Donna Harrison, an investigator for DSS's Child Protective Services division (CPS), interviewed S.M. at school. The same day, Harrison went to the Mollenhauer home. She examined the structure in which S.M. slept, which Harrison described as "a cage." She also observed firsthand that the Mollenhauers treated S.M. differently from her siblings in terms of both their demeanor toward S.M. and food preparation for her. Harrison further learned that S.M. had recently been to her pediatrician for a physical and the doctor had referred her to a

psychiatrist. The appellant showed Harrison the psychiatrist's card but did not indicate that anyone had taken steps to make an appointment for S.M.

As a result of Harrison's interview and observations during the home visit, she immediately removed S.M. from the home. While S.M. was with Harrison, she was polite, pleasant, and able to go to the bathroom on her own.

A subsequent evaluation performed by Dr. Robin Foster, medical director of the child protection team for Virginia Commonwealth University Health Systems, included a review of S.M.'s weight history. She noted that while "children fall into a [particular] growth percentile" at birth and are "expected . . . [to] stay [i]n that percentile," S.M.'s weight fell "precipitously" during the two years prior to her removal. Throughout S.M.'s first three years, her weight was between the 75th and 88th percentiles, which fell within a single percentile grouping.[2] Two years later, on the day after S.M.'s removal from the Mollenhauer home, her weight placed her in the 4th percentile. Dr. Foster explained that this history of weight loss constituted a decrease of five percentile groupings, significantly exceeding the decrease of "more than two percentile[]" groupings required to establish a failure to thrive.

Dr. Foster further noted that in the ten days between S.M.'s removal and her examination by Foster's team, S.M. gained an amount equal to 25% of her body weight, which placed her back in the 50th growth percentile. Foster testified that this rapid increase in weight indicated that "something [had been] acutely . . . interfering with her nutrition." She ruled out any organic medical cause and concluded that "[m]edically speaking the only difference in that ten-day period was the environment in which [S.M.] was living." S.M., who reported "that she didn't

---

[2] Dr. Foster testified that a child in the 85th percentile for weight would be "considered large" for his or her age but that whether the child was overweight would depend on the child's other "individual metrics," including "how much of [the weight] [was] subcutaneous fat and how much . . . [was] muscle and bone."

get [enough] to eat in the previous environment," "was a good eater in foster care." Based on S.M.'s medical records, self-reporting, and significant weight gain after removal, Dr. Foster diagnosed a failure to thrive resulting from nutritional neglect.

Finally, Dr. Foster opined that S.M.'s history and medical records were "consistent with [a] medical diagnosis of child torture" because the evidence "m[et] all of the most common criteria" for that diagnosis. S.M. told Dr. Foster's team that "she slept" in a cage and "was locked in." Dr. Foster noted that the child had soft tissue injuries of a type inconsistent with those typically incurred by young children during play, was physically restrained and isolated by being kept in the sleeping enclosure, was deprived of food, and was socially isolated in that she was not registered for kindergarten in a timely fashion. Dr. Foster also pointed out that children undergoing physical and psychological trauma tend to "become very anxious," which sometimes causes symptoms of regression, including bedwetting and soiling themselves. She further noted, based on her team's examination of S.M. both shortly after her removal and again eight months later, that S.M. was not manifesting any behavior that would "warrant . . . restrain[ing her in a] . . . box."[3]

Consistent with the evidence at trial as outlined above, the appellant and Michael were charged with two counts each of child abuse in violation of Code § 18.2-371.1 and child cruelty in violation of Code § 40.1-103. One set of the child abuse and cruelty charges related to a period of several months while S.M. was in daycare (the 2017 charges). The other set related to a narrower period of about two weeks, from August 27 to September 10, 2018, including time while S.M. was in kindergarten (the 2018 charges).

_____

[3] Dr. Foster also observed that in "review of cases across the country[,] it is not uncommon that one child . . . in a family with lots of other children . . . [is] the only one[] that [is] being deprived of food and . . . confined or restrained."

- 5 -

The appellant and Michael were represented by different counsel in a joint trial. After hearing the evidence, the trial court acquitted them of the two counts of child abuse in violation of Code § 18.2-371.1 and the 2017 charges of child cruelty in violation of Code § 40.1-103. The court found them guilty of one count each of child cruelty occurring in 2018. It sentenced the appellant and Michael each to five years in prison and suspended both sentences conditioned upon five years of good behavior.

## II. ANALYSIS

The appellant contends that the portion of Code § 40.1-103 that she was convicted of violating is void for vagueness. She further argues that the evidence admitted at trial was insufficient to prove that she engaged in behavior toward S.M. that violated the statute.

### A. Constitutional Challenge to the Third Clause of Code § 40.1-103

#### 1. Additional Background Related to the Constitutional Challenge

Code § 40.1-103 proscribes "caus[ing] or permit[ting]" any of three types of behavior toward a child in one's custody. The relevant indictments in this case tracked the language setting out all three methods of proving a violation of the statute. Prior to trial, neither the appellant nor Michael challenged the constitutionality of any portion of Code § 40.1-103.

During trial, the appellant and Michael made motions to strike based on <u>Commonwealth v. Carter</u>, 21 Va. App. 150 (1995), noting that it held the second clause of Code § 40.1-103 unconstitutionally vague.[4] Counsel did not argue that other portions of the statute were unconstitutional. The circuit court denied the motions to strike.

In closing, the appellant again mentioned that "[o]ne part of [Code § 40.1-103] ha[d] been declared unconstitutional." Counsel commented that other parts "seem[ed] . . . open

---

[4] That clause makes it a felony for "any person . . . having custody of a child [under 18] . . . willfully or negligently to cause or permit such child to be placed in a situation that its life, health or morals *may* be endangered." Code § 40.1-103(A) (emphasis added).

ended," but he did so only in the context of addressing whether the facts were sufficient to prove that the appellant had violated the statute. He did not specifically assert that any other part was unconstitutional.

In finding the appellant guilty, the trial judge confirmed that the *third clause* of the statute, which "deal[t] with caus[ing] or permit[ting a] child to be . . . tortured . . . or cruelly treated," remained constitutionally valid. He further found that "having [S.M.] locked in th[e] pen [all] night me[t] th[e] criteria . . . of being tortured and cruelly treated" for the child cruelty indictment covering the 2018 time period.

Following trial, the appellant and Michael filed a joint motion to set aside the verdict. The motion did not challenge the constitutionality of any portion of Code § 40.1-103. It raised only claims of "actual innocence" and "lack of evidence." The appellant noted that the statute did not define torture and argued that the Commonwealth's evidence did not meet the dictionary definition of the term. She further contended that the evidence did not prove a violation of Code § 40.1-103 in any other way, including through "cruel[] treat[ment]." She asserted that no evidence proved that S.M. "was placed in the wooden crib by either" her or Michael during the 2018 time period.

The appellant and Michael subsequently provided oral argument on their post-trial motions. At that hearing, for the first time, counsel for Michael argued in part that the third clause of Code § 40.1-103 was unconstitutionally vague because it did not define "torture[d]" or "cruelly treated."

Counsel for the appellant independently argued the motion to set aside. He suggested that the evidence was insufficient to prove cruelty and agreed with Michael's attorney regarding the lack of "a clear definition of how torture would be applied in this case." He also noted that Michael's attorney argued repeatedly that "there [was] no definition of [torture]," presumably

referring to the absence of one in the statutory scheme. However, the appellant's counsel neither specifically adopted the arguments presented by Michael nor articulated his own constitutional challenge to the statute. He did not claim that the lack of a definition rendered the statute unconstitutionally vague with respect to torture or cruel treatment.

In denying the motions, the judge "acknowledge[d] . . . room for debate about th[e] statute" due to the lack of "statutory definitions of the term[s] torture[d and] . . . cruelly treated." He noted his "previous finding . . . that the fact that [S.M.] was kept in th[e] enclosure was sufficient to prove that [she] was tortured or cruelly treated." The judge stated that he "st[ood] by that finding" and was "not prepared to declare the statute unconstitutional." Consequently, he denied the motions.

### 2. Application of Rule 5A:18 to the Constitutional Challenge

The Commonwealth asserts that Rule 5A:18 bars the challenge to the constitutionality of the third clause of Code § 40.1-103 because the appellant did not raise the issue below.

Pursuant to the contemporaneous objection requirement of Rule 5A:18, this Court will not consider an argument on appeal that was not presented to the trial court. See Stokes v. Commonwealth, 61 Va. App. 388, 396-97 (2013). Additionally, the *precise* nature of the objection must be clear because "[m]aking one specific argument on an issue does not preserve a separate legal point on the same issue for [appellate] review." Johnson v. Commonwealth, 58 Va. App. 625, 637 (2011) (quoting Edwards v. Commonwealth, 41 Va. App. 752, 760 (2003) (*en banc*), aff'd, No. 040019 (Va. Oct. 15, 2004) (unpublished order)); see Bethea v. Commonwealth, 297 Va. 730, 743-44 (2019). The contemporaneous objection rule "applies to bar even constitutional claims." Stokes, 61 Va. App. at 396 (quoting Farnsworth v. Commonwealth, 43 Va. App. 490, 500 (2004)). Further, of crucial importance in this case is the principle that "one party may not rely on the objection of another party to preserve an argument

for appeal without expressly joining in the objection." Linnon v. Commonwealth, 287 Va. 92, 102 (2014). The Supreme Court of Virginia has specifically rejected the theory that the purpose of the contemporaneous objection rule is met as to a particular defendant when she did not object below but her co-defendant objected and the trial court ruled on the issue. See id.

Here, at trial, the appellant did not challenge the constitutionality of the third clause of the statute, the portion she was convicted of violating. She addressed only the constitutionality of the statute's second clause, the portion struck down in Carter. The appellant's attorney commented that other parts of the statute "seem[ed] to be open ended," but he did so only in the context of addressing the sufficiency of the evidence to prove the offense. See Johnson, 58 Va. App. at 637.

Similarly, the appellant did not challenge the constitutionality of the statute in her written post-trial motion. At oral argument on the motion, Michael's attorney challenged the portion of the statute under which Michael was convicted, the third clause, as unconstitutionally vague. The appellant's attorney, however, neither "expressly join[ed]" Michael's challenge on constitutional grounds nor registered an independent constitutional objection on the appellant's behalf. See Linnon, 287 Va. at 102. Counsel argued only that the judge "really d[idn']t have a clear definition of how torture would be applied in this case" and that, "as [Michael's counsel] said [repeatedly], there [was] no [statutory] definition of that." The appellant's attorney did not argue that the third clause of the statute was so vague as to be unconstitutional. See Stokes, 61 Va. App. at 396-97. See generally D'Ambrosio v. D'Ambrosio, 45 Va. App. 323, 341 n.3 (2005) (noting "that 'unnecessary adjudication of a constitutional issue' should be avoided" (quoting Bell v. Commonwealth, 264 Va. 172, 203 (2002))).

Consequently, the appellant failed to comply with Rule 5A:18, and her assignment of error specifically challenging the third clause of Code § 40.1-103 as void for vagueness is barred on appeal.[5]

## B. Sufficiency of the Evidence

The appellant contends that the evidence was insufficient to prove that S.M. was tortured or cruelly treated within the meaning of the statute.

### 1. Additional Background Related to the Sufficiency Challenge

In convicting the appellant of violating Code § 40.1-103, the trial court observed that the statute required proof only that she "knew" about and "permitted" the child to be tortured or cruelly treated. It reasoned that S.M.'s "sleeping enclosure" was not "a bona fide special-needs bed." Instead, it was a "pen or cage" that the child "was kept locked in . . . at night." The court held that this evidence proved that the child was "tortured and cruelly treated." It concluded that the evidence was not sufficient to prove that the pen was in use during the 2017 time frame but did prove that it was in use on September 6, 2018, which was "within th[e 2018 indictment] time frame." Finally, the court found that the appellant "knew" about the use of the pen and "permitted it." When the parties moved to set aside the verdicts against them, the trial court repeated that "the fact that [S.M.] was kept in this enclosure was sufficient to prove that [she] was tortured or cruelly treated." It also referenced the evidence of S.M.'s weight, although the court said that its ruling was not based "on her weight per se."

---

[5] Because of our application of Rule 5A:18, we do not address whether the record establishes compliance with Code § 19.2-266.2, which requires a written motion challenging a statute's constitutionality prior to trial or a showing of good cause for failing to comply with its provisions. See Armstead v. Commonwealth, 56 Va. App. 569, 576 (2010) (recognizing that an appellate court must decide cases on "the best and narrowest ground available" (quoting Kirby v. Commonwealth, 50 Va. App. 691, 698 n.2 (2007))).

The evidence at trial regarding the "cage" was that Michael built it with the "general consensus of initially all four adults living in the house," including the appellant, and that S.M. slept in it five to seven nights per week. Robert testified that the appellant took care of the children "even [when their mother was] in the house" because his "ex-wife did not want to watch [the] children." He said that his ex-wife "originally" presented the idea of the enclosure and that the appellant and Michael "explain[ed] the necessity of it" to him.

When CPS Investigator Harrison visited the Mollenhauer home on September 6, 2018, Harrison asked to see where S.M. slept. The appellant agreed to show her but said, "[Y]ou are not going to like what you . . . see." After examining the sleeping enclosure, Harrison described it as "a cage" located "in a closet with a curtain." The base was the standard size for a crib, but it had been shortened and had a "top" made of "two by fours." The cage was "no more than . . . about three feet" tall and was shorter in height than S.M. It had slats and a door with a latching mechanism and contained "a mattress that didn't have any padding or covering." The cage also had "a drainage hole," and beneath it was a scrap of linoleum covered with baking soda, which the appellant stated "was to [reduce] the smell from [S.M.] urinating and defecating on herself while in that area."

Both the appellant and Michael said that the enclosure was locked at night and that S.M. slept in the cage because of her bad behavior. They asserted that the cage was necessary to prevent S.M. from "stealing food," getting "into the garbage" and "everything," and "bothering everybody."

Using the cage also permitted the appellant, Michael, and Robert to restrict S.M.'s food consumption in a manner that contributed to her failure to thrive. Due in part to the use of the cage and the nutritional neglect, Dr. Foster testified that the treatment of S.M. was consistent with a medical diagnosis of child torture.

2. Merits of the Sufficiency Claim

The appellant asserts that the evidence was insufficient to prove that she tortured or cruelly treated S.M. or, alternatively, that the behavior occurred within the 2018 time frame in the indictment.

When considering the sufficiency of the evidence to prove the violation of a particular statute, the appellate court views that evidence in the "light most favorable" to the Commonwealth, the party who prevailed in the trial court. See, e.g., Commonwealth v. Moseley, 293 Va. 455, 463 (2017) (quoting Bowman v. Commonwealth, 290 Va. 492, 494 (2015)). "We examine a trial court's factfinding 'with the highest degree of appellate deference.'" Whitfield v. Commonwealth, 57 Va. App. 396, 403 (2010) (quoting Thomas v. Commonwealth, 48 Va. App. 605, 608 (2006)). This deference is owed to both the trial court's assessment of the credibility of the witnesses and the inferences to be drawn "from basic facts to ultimate facts." See Davis v. Commonwealth, 65 Va. App. 485, 500 (2015) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (1979)). In the end, the reviewing court "ask[s] whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Id. (quoting Crowder v. Commonwealth, 41 Va. App. 658, 663 (2003)).

The fact finder, in this case the trial court, "is entitled to consider all of the evidence," direct and circumstantial, "in reaching its determination." Moseley, 293 Va. at 463 (quoting Commonwealth v. Hudson, 265 Va. 505, 512-13 (2003)). Similarly, the appellate court's review of the record generally "is not limited to the evidence mentioned by a party in trial argument or by the trial court in its ruling." Bolden v. Commonwealth, 275 Va. 144, 147 (2008). Appellate review requires a "totality-of-the-evidence analysis," including the use of the cage and the related nutritional neglect, rather than a "fragmented assessment of the record." See Moseley, 293 Va. at 464, 466.

Resolving the question of the sufficiency of the evidence in this case also requires statutory interpretation. "[T]o the extent that the issue on appeal requires [a determination of] the meaning of a statute and its terms, [this Court] reviews that issue *de novo*." Green v. Commonwealth, 72 Va. App. 193, 202 (2020). Although criminal statutes must be "strictly construed against the Commonwealth, the appellate court must also 'give reasonable effect to the words used' in the legislation." Id. (quoting Johnson v. Commonwealth, 37 Va. App. 634, 639 (2002)). "[T]he general rule of statutory construction is to infer the legislature's intent from the plain meaning of the language used." Hillman v. Commonwealth, 68 Va. App. 585, 592-93 (2018) (quoting Meeks v. Commonwealth, 274 Va. 798, 802 (2007)). "Thus, '[a]n undefined term must be given its ordinary meaning, [in light of its] context . . . .'" Id. at 593 (first alteration in original) (quoting Meeks, 274 Va. at 802); see Jones v. Commonwealth, 296 Va. 412, 415 (2018) (considering the standard dictionary definition of an undefined statutory term).

The statute at issue in this appeal, Code § 40.1-103, provides in pertinent part that "[i]t shall be unlawful for any person . . . having the custody of any child . . . to cause or permit such child to be . . . tortured . . . or cruelly treated." Code § 40.1-103(A).

Under the plain meaning of Code § 40.1-103, a conviction for violating the statute does not require proof that the appellant *personally* tortured or cruelly treated S.M., only that she "cause[d] or permit[ted]" the actions constituting torture or cruel treatment to occur. See Code § 40.1-103(A). The appellant acknowledges that she "agreed to [the] build[ing of] . . . the cage" and it "*was* constructed to enhance the ability of [all of] S.M.'s caretakers," including her, "to control [S.M.]." Therefore, the only issue in dispute is whether the evidence supported a finding that the use of the cage, viewed in context, caused S.M. to be tortured or, alternatively, cruelly treated during the time frame in the 2018 indictment.

Proving cruel treatment manifestly requires evidence of less severe behavior than proving torture. Cf. generally People v. Shelton, 360 N.W.2d 234, 236-37 (Mich. Ct. App. 1984) (holding under state statutes proscribing child cruelty and torture but not defining the terms that torture required proof of the infliction of a greater "degree of pain or injury"). Accordingly, we consider the meaning of the lesser term "cruelly treated" first. "Cruelty" is defined as the "disposition to inflict pain or suffering." Cruelty, Webster's Third New International Dictionary (1993) [hereinafter Webster's]; see Cruelty, The American Heritage Dictionary of the English Language (5th ed. 2011) [hereinafter American Heritage] (defining "cruelty" as "[s]omething . . . that causes pain or suffering"); see also Cruelty, Black's Law Dictionary (11th ed. 2019) (listing "cruelty" and "cruel treatment" as synonyms). "Treatment" means "conduct or behavior towards another." Cook v. Commonwealth, 268 Va. 111, 114 (2004) (quoting Treatment, Webster's, supra). In light of these definitions, the term "cruelly treated," as used in Code § 40.1-103, describes engaging in behavior toward another that causes physical or emotional pain or suffering in that other person. See Webster's, supra, cruelty, dispose, pain, suffer; American Heritage, supra, cruelty; see also State v. Malpher, 947 A.2d 484, 488 (Me. 2008) (holding that "cruelly treated" in an animal welfare statute "refer[red] to treatment . . . caus[ing] suffering or pain"), cited with approval in State v. Peck, 93 A.3d 256, 260 (Me. 2014).

The evidence here, viewed under the proper standard, supports the trial court's finding that the appellant caused or permitted S.M. to be cruelly treated. See generally Hutchins v. Hutchins, 93 Va. 68, 69-71 (1896) (in a divorce case, recognizing cruel treatment based on a husband's failure to protect his wife from being verbally abused and physically battered by the husband's mother).

The appellant acknowledged during Harrison's home visit on September 6, 2018, that she knew S.M. was being kept in the cage at night and specifically stated that Harrison was "not

- 14 -

going to like what [she saw]" when the appellant showed her the enclosure. The evidence also proved that the appellant, who routinely helped Robert care for S.M., had supported the construction of the cage for nighttime use and helped convince Robert of its necessity. The cage was too short to permit S.M. to stand while inside it. It was locked so that S.M. could not get out without assistance. The cage had a "drainage hole" through which S.M.'s urine and feces could flow, and a linoleum mat covered with baking soda had been placed beneath the cage to catch such substances and neutralize the odors. Although the family reported that S.M. had potty training issues and her father expressed the opinion that she soiled herself "mostly on purpose," CPS Investigator Harrison testified that S.M. had no bowel issues following her removal from the home other than a minor blockage resolved with stool softeners.

Further, one of the stated purposes of the cage was to prevent S.M. from obtaining food at night. The appellant personally described S.M.'s efforts to obtain food as "stealing" it, despite evidence that S.M.'s weight had dropped "precipitously" in the two years during which she was being deprived of adequate nutrition while living in the appellant's home. Daycare and elementary school staff testified regarding the limited nature of the food and beverages sent with S.M. for lunch and snacks. Also, in S.M.'s short time in kindergarten while living in the Mollenhauers' home, her lunches were small, and she always appeared "very hungry." Although caregivers were told that S.M. could not have sugar because she was "allergic" or it would "mess up" her bowels, one day when she "had been good," they were "allowed to give her a cupcake all of a sudden," supporting the inference that the true basis for the food restrictions was not related to allergies or her bowels.

No evidence established that S.M. had a medical problem causing her alleged bowel issues or that the family had attempted to consult with a gastroenterologist. To the contrary, the appellant reported that S.M.'s pediatrician referred her to a psychiatrist about two weeks before

DSS removed her from the home but provided no indication that anyone had taken steps to make the recommended appointment. Dr. Foster, the Commonwealth's child abuse expert, testified that children experiencing physical and psychological trauma tend to become "very anxious," which can cause symptoms of regression, including soiling themselves.

Dr. Foster also testified about the use of the cage and the significance of S.M.'s weight loss. She stated that when her team evaluated the child both immediately following her removal and after eight months in foster care, S.M. was not exhibiting any behavior that would "warrant . . . restrain[ing her in a] . . . box." Foster additionally related that children are expected to remain in roughly the same birth weight percentile grouping into which they are born. S.M. was in the 75th to 90th percentile grouping from birth to age three. Between 2016 and the time of S.M.'s removal from the home in 2018, her weight fell from the 88th percentile down to the 4th percentile, past five percentile group markings. Foster testified that a decrease of more than two percentile groupings constitutes a weight loss significant enough to show failure to thrive, whereas S.M. experienced a drastic decrease of five percentile groupings. Foster emphasized that S.M.'s weight immediately began to improve upon her removal from the home, increasing by an amount equal to 25% of her body weight in just ten days. She concluded that nothing medical had caused S.M.'s failure to thrive and that it resulted from food deprivation amounting to nutritional neglect.[6]

---

[6] The appellant's theory of the case was that S.M. was overweight at age three and the family did not act criminally by trying to restrict her access to "sugary things." However, Dr. Foster and CPS Investigator Harrison resisted counsel's attempt to elicit testimony to support this claim. The growth percentiles that Dr. Foster discussed were solely percentiles for weight. As she noted, calculating whether a child is overweight at any particular age requires the consideration of factors in addition to weight. As she further explained, a weight above the 85th growth percentile indicated that S.M. was "large[r]" than most other children her age but did not reflect that she was overweight.

Dr. Foster further opined that S.M.'s history and medical records were "consistent with" a medical diagnosis of child torture. Two of the factors for that diagnosis were that she slept in a locked cage and was deprived of food. Evidence that these factors support a medical diagnosis of child torture necessarily also supports the conclusion that they constituted the lesser behavior of cruel treatment under Code § 40.1-103.

The record establishes that the appellant caused or permitted S.M. to be cruelly treated during the 2018 time period. Accordingly, the Court affirms her conviction for violating Code § 40.1-103 without considering whether she caused or permitted the child to be tortured. See Pittman v. Commonwealth, 69 Va. App. 632, 636-37 (2019).

### III. CONCLUSION

The appellant's assignments of error do not support a reversal. The appellant did not raise the constitutional challenge with specificity in the trial court, thereby failing to comply with the contemporaneous objection rule. Further, the evidence was sufficient to prove that the appellant caused or permitted S.M. to be cruelly treated by being locked in a cage at night, which not only required S.M. to soil herself but also facilitated the family's restrictions on her food consumption and led to her precipitous weight loss and diagnosis of failure to thrive. Consequently, we affirm the appellant's conviction.

Affirmed.